UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| MOBILE TELECOMMUNICATIONS TECHNOLOGIES, LLC, | § § § | |
| Plaintiff, | § § | C.A. No. 2:16-cv-0007 |
| v. | § § | JURY TRIAL REQUESTED |
| TIME WARNER CABLE INC., TIME WARNER CABLE ENTERPRISES LLC, and TIME WARNER CABLE TEXAS LLC | § § § § | |
| Defendants. | | |

## **PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Mobile Telecommunications Technologies, LLC ("MTel"), by and through its undersigned counsel, files this complaint against Time Warner Cable Inc., Time Warner Cable Enterprises LLC, and Time Warner Cable Texas LLC (collectively "TWC" or "Defendants") for infringement of U.S. Patent Nos. 5,590,403 (the "'403 Patent"), 5,659,891 (the "'891 Patent"), and 5,915,210 (the "'210 Patent"), (collectively, the "Asserted Patents" or the "Patents-in-Suit") in accordance with 35 U.S.C. § 271 and alleges as follows:

## **PARTIES**

1.      Plaintiff MTel is a Delaware limited liability company having a principal place of business at 1720 Lakepointe Drive, Suite 100, Lewisville, TX 75057.

2.      MTel is a wholly owned subsidiary of United Wireless Holdings Inc. ("United Wireless").  In 2008, United Wireless, through another of its wholly owned subsidiaries, Velocita Wireless LLC, purchased the SkyTel wireless network, including assets related to SkyTel's more than twenty-year history as a wireless data company.  Velocita Wireless LLC, continued to operate the SkyTel wireless data network after the acquisition.  As a result of that

transaction, United Wireless gained ownership and control over the intellectual property portfolio, including patents, that several SkyTel-related entities, including Mobile Telecommunication Technologies Corp. ("MTel Corp."), Destineer Corp., and SkyTel Communications, developed over the years.  United Wireless subsequently assigned certain patent assets, including the Patents-in-Suit, together with all rights of recovery related to those patent assets, to its wholly owned subsidiary, MTel, which is the plaintiff here.

3.      In a widely publicized November, 2014 jury trial in this District, MTel was awarded favorable infringement and validity verdicts against Apple Inc. on the '403, '210, and '891 Patents.

4.      MTel alleges, upon information and belief, that Time Warner Cable Inc. is a corporation organized and existing under the laws of Delaware, with a principal place of business at 60 Columbus Circle, New York, New York 10023.

5.      On information and belief, Defendant Time Warner Cable Enterprises LLC is a company organized and existing under the laws of the State of Delaware, with its principal place of business at 60 Columbus Circle, New York, New York, 10023.

6.      Time Warner Cable Inc. does business in this district and may be served with process by serving its registered agent, Jeffrey Zimmerman, 60 Columbus Circle, New York, New York 10023.

7.      Time Warner Cable Enterprises LLC does business in this district and may be served with process by serving CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

8.      Time Warner Cable Texas LLC does business in this district and may be served with process by serving CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.

9.      MTel alleges that TWC made, used, sold, and offered to sell, infringing wireless equipment and services, during the terms of the '403 Patent, the '210 Patent, and the '891 Patent (the "Relevant Period,") within the United States and within this judicial district, the Eastern District of Texas ("this District").

10.     On information and belief, TWC maintains an office within this District at 1460 Calder Ave., Beaumont, TX.

11.     MTel alleges that TWC operated Wi-Fi networks within its customers' premises and at thousands of hotspots during the Relevant Period.



http://www.timewarnercable.com/en/internet/internet-service.html

12.     TWC provided to its customers with customer-premises equipment, such as cable modems, wireless routers, and modem/wireless router gateways, which support IEEE 802.11 a, g, n or ac standards ("Wi-Fi Enabled CPE.")

13.     MTel alleges that examples of Wi-Fi Enabled CPE that TWC provided to its customers include models made by ARRIS, Motorola, Ubee, Netgear, and Thomson (now Technicolor).

14.     TWC leased for a monthly fee (or bundled into its monthly charge for Internet service) Wi-Fi Enabled CPE to customers, including customers residing within this District.

15.     TWC's specially trained technicians set up Wi-Fi Enabled CPE, created the network, and enabled the best settings for Wi-Fi Enabled CPE leased by customers.  TWC also provided full support for Wi-Fi Enabled CPE leased by customers 24 hours a day, 7 days a week.

16.     MTel alleges that TWC directed its customers who wished to purchase, as opposed to lease, Wi-Fi Enabled CPE to a list of Wi-Fi Enabled CPE that it authorized for use on its systems.

17.     TWC controlled the features and functionality of Wi-Fi Enabled CPE used in the delivery of its high speed data service, regardless as to whether such Wi-Fi Enabled CPE was purchased or leased by the customer.

18.     TWC controlled the features and functionality of Wi-Fi Enabled CPE used in the delivery of its high speed data service by, for instance, causing software (*e.g.* firmware or updates) to be downloaded to Wi-Fi Enabled CPE and otherwise making configuration changes to Wi-Fi Enabled CPE.

19.     TWC provisioned and used Wi-Fi Enabled CPE in order to distribute to its customers its high speed data service, which it sold to its customers.

20.     TWC sold to customers wireless Internet service, including a service called as "Home WiFi," which enabled its customers to enjoy TWC's wireless Internet access for all the Wi-Fi enabled devices in their homes.

21.     TWC used Wi-Fi Enabled CPE in order to provide home security and automation service (*e.g.* IntelligentHome), which required customers also to subscribe to TWC high speed data service.

22.     MTel alleges that TWC operated a public Wi-Fi service at tens of thousands of locations, including those within this District.





http://www.timewarnercable.com/en/internet/features/wifi.html;http://coverage.twcwifi.com/

23.     MTel alleges that TWC's used wireless access points that support IEEE 802.11 a, g, n or ac standards ("Wi-Fi Enabled Access Points") in the operation of its public Wi-Fi service, such as TWC WiFi Hotspots.

24.     On information and belief, TWC was party to an agreement among Bright House Networks, Cablevision, Comcast, and Cox Communications that allowed each other's high-speed Internet customers to access hotspots that have the wireless network name "CableWiFi."   See www.cablewifi.com.

25.     TWC used its Wi-Fi Enabled Access Points to extend Wi-Fi service using the wireless network names: TWCWiFi, CableWiFi, and TWCWiFi-Passpoint.

26.     MTel alleges, upon information and belief, that during the Relevant Period, TWC used Wi-Fi Enabled Access Points to provide Wi-Fi service to customers within the range of at least 50,000 hotspots, including those in this District.

27.     TWC used Wi-Fi Enabled CPE and Wi-Fi Enabled Access Points in order to provide its streaming TV service, known as TWC TV, to customers' wireless devices, such as smartphones, SMART TVs, and gaming systems, on which TWC's applications ran.

28.     TWC designed, delivered, tested, and installed both in its facilities and on its customers' networks, applications designed for Wi-Fi access networks, Wi-Fi Enabled CPE, and Wi-Fi Enabled Access Points.

29.     MTel alleges that, during the Relevant Period, TWC made, used, sold, and offered to sell, wireless equipment and services, including Home WiFi, TWC WiFi, Wi-Fi Enabled CPE, and Wi-Fi Enabled Access Points, which directly infringed the claims of the '403 Patent, the '210 Patent, and the '891 Patent, within the United States and within this District.

30.     MTel alleges that TWC made, used, sold, and offered to sell, systems and products that embodied the claimed methods of the Patents-in-Suit because, for instance, such systems and products employed certain subcarrier frequency structures in the IEEE 802.11 orthogonal frequency-division multiplexing ("OFDM") scheme or techniques consistent with the MIMO aspects of IEEE 802.11 n or ac standards (*e.g.*, as described in "Wi-Fi CERTIFIED n: Longer-Range, Faster-Throughput, Multimedia-Grade Wi-Fi Networks" at 5-6, available at http://www.wi-fi.org/file/wi-fi-certified-n-longer-range-faster-throughput-multimedia-grade-wi-fi-networks-2009):

> A MIMO system has some number of transmitters (N) and receivers (M) ... Signals from each of the N transmitters can reach each of the M receivers via a different path in the channel.  A MIMO device with multiple antennas is capable of sending multiple spatial streams – spatially distinct data streams within the

same channel.  A MIMO device with multiple antennas is capable of receiving multiple spatial streams.   Multipath helps decorrelate the received signals enabling transmission of multiple data streams through the same MIMO channel – a technique called spatial multiplexing.  MIMO can multiply data rate through a technique called spatial multiplexing - dividing a data stream into several branches and sending it as multiple parallel data streams simultaneously in the same channel.

MIMO can also be used to improve the robustness and range of 802.11n communications through a technique called spatial diversity.  When the same data stream is transmitted across multiple spatial streams error rate can be reduced.  An additional technique improving range and reliability called Space Time Block Coding (STBC) is also incorporated into Wi-Fi CERTIFIED n.

A copy of this webpage is attached as Exhibit D.

31.     In addition to its allegations concerning Wi-Fi networks, MTel alleges, on information and belief, that TWC, in order to provide wireless backhaul services, operated microwave networks, which infringed the '403, '210, and '891 Patents because, for instance, such networks employed certain subcarrier frequency structures and MIMO techniques ("MIMO Microwave Equipment.")

32.     TWC has voluntarily and purposely placed these and other products and services into the stream of commerce with the expectation that they would be offered for sale and sold in Texas and in this District.

## JURISDICTION AND VENUE

33.     This is an action for patent infringement under the patent laws of the United States of America, 35 U.S.C. § 1 et seq.  This Court has subject matter jurisdiction over the matters pleaded in this complaint under 28 U.S.C. §§ 1331 and 1338(a).  Venue is proper under 28 U.S.C. §§ 1391 and 1400(b).

34.     This Court has personal jurisdiction over the Defendants under the law of the State of Texas, including the Texas long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042.

35.     As detailed in paragraphs above, TWC regularly and deliberately engaged in activities that resulted in the making, using, selling, offering for sale, or importing of infringing products or processes in the State of Texas and in this judicial district, where, upon information and belief, TWC operates Wi-Fi networks for tens of thousands of customers in Beaumont, Texas.   These activities violate the United States patent rights MTel has under the Asserted Patents.   In addition, this Court also has personal jurisdiction over TWC because TWC conducts business in Texas and in this District.

**FIRST CLAIM FOR RELIEF**

(Infringement of Claims 1, 10, 11 of United States Patent No. 5,590,403)

36.     MTel incorporates by reference the preceding paragraphs of this Complaint as if set forth here in full.

37.     The United States Patent and Trademark Office ("USPTO") duly and lawfully issued the '403 Patent, entitled "Method and System for Efficiently Providing Two Way Communication between a Central Network and Mobile Unit," on December 31, 1996.   MTel is the assignee of all right, title, and interest in and to the '403 Patent and possesses the exclusive right of recovery, including the exclusive right to recover for past infringement.   Each and every claim of the '403 Patent is valid and enforceable and each enjoys a statutory presumption of validity separate, apart, and in addition to the statutory presumption of validity enjoyed by every other of its claims. 35 U.S.C. § 282.   A true and correct copy of the '403 Patent is attached as Exhibit A.

38.     MTel alleges that, during the Relevant Period, TWC directly infringed one or more claims of the '403 Patent by making, using, selling, and offering to sell Wi-Fi Enabled CPE, Wi-Fi Enabled Access Points, MIMO Microwave Equipment, and associated services (*e.g.*

TWC WiFi, Home WiFi, and IntelligentHome) and applications relying on Wi-Fi networks (*e.g.* TWC TV).

39.     MTel alleges that TWC's use of Wi-Fi Enabled CPE infringed one or more claims of the '403 Patent literally and/or under the doctrine of equivalents, by, among other things, using MIMO functionality and dynamically reassigning transmitters due to changing conditions within the network in order to allow roaming between wireless access points.

40.     TWC implemented through its Wi-Fi networks, services, and equipment the IEEE 802.11 standard versions n and ac, which employed MIMO technology in several variations to significantly increase data rates and coverage relative to the previous versions of the standard. The different MIMO configurations implemented by TWC provided facilities to dynamically optimize system transmission for a desired level of robustness and diversity or capacity gain, depending on signal-to-noise ratio (SNR) and channel conditions.

41.     The main relevant MIMO techniques that TWC used included (i) Spatial Multiplexing (SM); (ii) Space Time Block Coding (STBC); (iii) Spatial Expansion (SE); (iv) Beam Forming (BF); and (v) HT Duplicate mode (MCS 32).

42.     MTel alleges that TWC's use and operation of Wi-Fi Enabled CPE, through which TWC distributed its high speed data service to customers, directly infringed the '403 Patent, at least because such equipment employed MIMO techniques described above.

43.     MTel alleges that Wi-Fi Enabled CPE listed in attached Exhibit E, and TWC's use thereof, directly infringed the '403 Patent at least because such equipment embodied the asserted method claims of the '403 Patent.  This list is non-limiting and will be supplemented after appropriate discovery.

44.     MTel alleges that TWC infringed the '403 Patent each time it leased for a monthly fee Wi-Fi Enabled CPE to its high speed data service customers in order to wirelessly distribute the service throughout their homes or businesses.

45.     MTel alleges that TWC directly infringed the '403 Patent when its field service technicians installed and tested Wi-Fi Enabled CPE.

46.     MTel alleges that TWC directly infringed the '403 Patent when, for example, its technicians tested the maximum throughput that such Wi-Fi Enabled CPE achieved through, for example, causing a speed test to occur over a wireless data connection extending from an IEEE 802.11 n or ac device (*e.g.* a computer, tablet, television, media streaming device, or smartphone) through Wi-Fi Enabled CPE to TWC's speed test server.

47.     MTel alleges that TWC directly infringed the '403 Patent by TWC's use and operation of Wi-Fi Enabled Access Points, through which TWC distributed high speed data service (*e.g.* TWC WiFi) to customers in locations, such as parks and shopping centers, at least because Wi-Fi Enabled Access Points employed MIMO techniques described above.

48.     MTel alleges that TWC directly infringed the '403 Patent when its field service technicians installed and tested transmissions from Wi-Fi Enabled Access Points.

49.     MTel alleges that TWC directly infringed the '403 Patent when Wi-Fi service was used by customers through Wi-Fi Enabled Access Points that provided service under the wireless network name "CableWiFi" because, even if the operator of any such Wi-Fi Enabled Access Point is not itself TWC, upon information and belief, such operator was directed and controlled by TWC, pursuant to the collaboration agreement among Bright House Networks, Cablevision, Comcast, Cox Communications, and Time Warner Cable so that such operator's use of Wi-Fi Enabled Access Points was attributable to TWC.

50.     MTel alleges that TWC's use of microwave networks during the Relevant Period directly infringed the '403 Patent at least because such microwave networks employed MIMO techniques that are consistent with the MIMO techniques described above.

51.     As a result of TWC's unlawful infringement of the '403 Patent, MTel has suffered damage.   MTel is entitled to recover from TWC damages adequate to compensate for such infringement.

## SECOND CLAIM FOR RELIEF

(Infringement of Claims 1, 2, 3, 4 and 5 of United States Patent No. 5,659,891)

52.     MTel incorporates by reference the preceding paragraphs of this Complaint as if set forth here in full.

53.     The USPTO duly and lawfully issued the '891 Patent, entitled "Multicarrier Techniques in Bandlimited Channels," on August 19, 1997.   MTel is the assignee of all right, title, and interest in and to the '891 Patent and possesses the exclusive right of recovery, including the exclusive right to recover for past, present, and future infringement.   Each and every claim of the '891 Patent is valid and enforceable and each enjoys a statutory presumption of validity separate, apart, and in addition to the statutory presumption of validity enjoyed by every other of its claims.   35 U.S.C. § 282.   A true and correct copy of the '891 Patent is attached as Exhibit B.

54.     MTel alleges that, during the Relevant Period, TWC directly infringed one or more claims of the '891 Patent by making, using, selling, and offering to sell Wi-Fi Enabled CPE, Wi-Fi Enabled Access Points, MIMO Microwave Equipment, and associated services (*e.g.* TWC WiFi, Home WiFi, and IntelligentHome) and applications (*e.g.* TWC TV) relying on Wi-Fi networks.

55.   MTel alleges, upon information and belief, that TWC's Wi-Fi networks and equipment directly infringe one or more claims of the '891 Patent literally and/or under the doctrine of equivalents, by among other things, having used certain subcarrier frequency structures of the IEEE 802.11 orthogonal frequency-division multiplexing ("OFDM") scheme.

56.   OFDM systems contain individual subcarriers that are orthogonally spaced apart in the frequency domain such that they do not interfere with each other as shown in the figure below. To illustrate this concept, the power spectrum for four modulated subcarriers is shown in the below figure, with solid, dotted, dash-dotted, and dashed lines, respectively. It can be seen that, at the center frequency of each subcarrier, the power spectra of the other subcarriers have nulls in the spectrum and thus do not produce interference.



**Figure 2.2**   Power spectrum of the individual subcarriers of the OFDM waveform.

57.   MTel alleges, for example, that TWC directly infringed claims of the '891 Patent in regards to the 802.11 systems that its Wi-Fi Enabled CPE and Wi-Fi Enabled Access Points implemented.  For instance, when such equipment was using the 20 MHz channel bandwidth option, 64 subcarriers could fit into the available bandwidth of 20 MHz because 20 MHz = 64 x 312.5 kHz.   In the 802.11 systems of interest, the orthogonal subcarrier spacing ($\Delta$F) is 312.5

kHz.    However, because of spectral band limitations, several subcarriers on each side of the band are not employed to minimize interference to adjacent channels and meet the transmit spectrum mask imposed by regulatory requirements.  Since in the 20 MHz channel there are 10 MHz on both sides of the center frequency, the frequency separation from the outermost used subcarrier to the band edge is 1,250 kHz which corresponds to 4x $\Delta F$, i.e. four times the inter-subcarrier frequency separation. Thus, by avoiding transmission on the outermost subcarriers, a guard-band is created that allows meeting the frequency mask restriction and enables the power spectral density to drop from 0 dBr at 9 MHz from the center frequency to -20 dBr at 11 MHz from the center frequency. Beyond 11 MHz, we have active subcarriers on the adjacent 20 MHz channel and this guard band arrangement provides reduced levels into adjacent channels.  When operating using a 20 MHz channel for example, each subcarrier is spaced 0.3125 MHz apart. Using 52 subcarriers at a frequency spacing of 0.3125 MHz occupies 16.25 MHz for data transmission. The remaining 3.75 MHz of the 20 MHz channel is used as a guard on the upper and lower edge of the band—1.875 MHz at each edge. Therefore, the claimed frequency difference between the center frequency of the outer most subcarrier and the band edge (here, 1.875 MHz) is more than half the frequency difference between the center frequencies of each adjacent subcarrier (here, 0.3125 MHz / 2 or 0.15625 MHz).

58.    MTel alleges that TWC's use and operation of Wi-Fi Enabled CPE, through which TWC distributed its high speed data service (*e.g.* Home WiFi) to customers, directly infringed the '891 Patent, at least because such Wi-Fi Enabled CPE operated according to the IEEE 802.11 OFDM scheme.

59.    MTel alleges that TWC directly infringed the '891 Patent when its field service technicians installed and tested Wi-Fi Enabled CPE.  MTel alleges that TWC directly infringed

the '891 Patent when, for example, its technicians tested the maximum throughput that such Wi-Fi Enabled CPE achieved.

60.      MTel alleges that TWC infringed the '891 Patent each time it leased for a monthly fee Wi-Fi Enabled CPE to its high speed data service customers in order to wirelessly distribute the service throughout their homes or businesses.

61.      MTel alleges that TWC directly infringed the '891 Patent by TWC's use and operation of Wi-Fi Enabled Access Points, through which TWC distributed high speed data service (*e.g.* TWC WiFi), to customers in locations, such as parks and shopping centers, at least because Wi-Fi Enabled Access Points operated according to the IEEE 802.11 OFDM scheme.

62.      MTel alleges that TWC directly infringed the '891 Patent when its field service technicians installed and tested Wi-Fi Enabled Access Points.

63.      MTel alleges that TWC directly infringed the '891 Patent when Wi-Fi service was used by customers through Wi-Fi Enabled Access Points that provided service under the wireless network name "CableWiFi" because, even if the operator of any such Wi-Fi Enabled Access Point is not itself TWC, upon information and belief, such operator is directed and controlled by TWC, pursuant to the collaboration agreement among Bright House Networks, Cablevision, Comcast, Cox Communications, and Time Warner Cable, so that such operator's use of Wi-Fi Enabled Access Points was attributable to TWC.

64.      MTel alleges that TWC's uses microwave networks directly infringed the '891 Patent at least because such microwave networks implemented channel structuring consistent with the description above.

65.     As a result of TWC's unlawful infringement of the '891 Patent, MTel has suffered damage.   MTel is entitled to recover damages from TWC adequate to compensate for such infringement.

### THIRD CLAIM FOR RELIEF

(Infringement of Claims 1, 7, 8, 10, 15, 16, 17, and 19 of United States Patent No. 5,915,210)

66.     MTel incorporates by reference the preceding paragraphs of this Complaint as if set forth here in full.

67.     The USPTO duly and lawfully issued the '210 Patent entitled, "Method and System for Providing Multicarrier Simulcast Transmission," on June 22, 1999.   MTel is the assignee of all right, title, and interest in and to the '210 Patent and possesses the exclusive right of recovery, including the exclusive right to recover for past, present, and future infringement. Each and every claim of the '210 Patent is valid and enforceable and each enjoys a statutory presumption of validity separate, apart, and in addition to the statutory presumption of validity enjoyed by every other of its claims.   35 U.S.C. § 282.   A true and correct copy of the '210 Patent is attached as Exhibit C.

68.     MTel alleges that, during the Relevant Period, TWC directly infringed one or more claims of the '210 Patent by making, using, selling, and offering to sell Wi-Fi Enabled CPE, Wi-Fi Enabled Access Points, MIMO Microwave Equipment, and associated services (*e.g.* TWC WiFi, Home WiFi, and IntelligentHome) and applications relying on Wi-Fi networks (*e.g.* TWC TV).

69.     MTel alleges that TWC's use of Wi-Fi Enabled CPE, through which TWC distributed its high speed data service to customers, infringed one or more claims of the '210 Patent literally and/or under the doctrine of equivalents by, among other things, employing

MIMO functionality and certain multi-carrier frequency structures, such as OFDM, as described above.

70.     MTel alleges that Wi-Fi Enabled CPE listed in attached Exhibit E, and TWC's use thereof, directly infringes the '210 Patent at least because such equipment embodies the asserted method claims of the '210 Patent.  This list is non-limiting and will be supplemented after appropriate discovery.

71.     MTel alleges that TWC infringed the '210 Patent each time it leased for a monthly fee Wi-Fi Enabled CPE to its high speed data service customers in order to wirelessly distribute the service throughout their homes or businesses.

72.     MTel alleges that TWC directly infringed the '210 Patent when, for example, its technicians tested the maximum throughput that such Wi-Fi Enabled CPE achieved through, for example, causing a speed test to occur over a wireless data connection extending from an IEEE 802.11 n or ac device (e.g. a computer, tablet, television, media streaming device, or smartphone) through Wi-Fi Enabled CPE to TWC's speed test server.

73.     MTel alleges that TWC directly infringed the '210 Patent by TWC's use and operation of Wi-Fi Enabled Access Points, through which TWC distributed high speed data service (*e.g.* TWC WiFi) to customers in locations, such as parks and shopping centers, at least because Wi-Fi Enabled Access Points employed MIMO functionality and operated according to the IEEE 802.11 OFDM scheme as further described above.

74.     MTel alleges that TWC directly infringed the '210 Patent when its field service technicians installed and tested Wi-Fi Enabled Access Points.

75.     MTel alleges that TWC directly infringed the '210 Patent when Wi-Fi service was used by customers through Wi-Fi Enabled Access Points that provided service under the wireless

network name "CableWiFi" because, even if the operator of any such Wi-Fi Enabled Access Point is not itself TWC, upon information and belief, such operator is directed and controlled by TWC, pursuant to the collaboration agreement among Bright House Networks, Cablevision, Comcast, Cox Communications, and Time Warner Cable so that such operator's use of Wi-Fi Enabled Access Points was attributable to TWC.

76.     MTel alleges that TWC's use of microwave networks directly infringed the '210 Patent at least because such microwave networks employ MIMO techniques and an OFDM scheme consistent with the above descriptions.

77.     As a result of TWC's unlawful infringement of the '210 Patent, MTel has suffered damage.   MTel is entitled to recover damages from TWC adequate to compensate for such infringement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff MTel prays for entry of judgment against TWC as follows:

A.     That TWC directly infringed each of the Asserted Patents under 35 U.S.C. § 271(a);

B.     That TWC provide to MTel an accounting of all gains, profits, savings, and advantages derived by TWC's direct infringement of the Asserted Patents, and that MTel be awarded damages adequate to compensate for the wrongful infringement by TWC, in accordance with 35 U.S.C. § 284;

C.     That this case be declared an exceptional one in favor of MTel under 35 U.S.C. § 285, and that MTel be awarded its reasonable attorneys' fees and all other costs and expenses incurred in connection with this civil action in accordance with 35 U.S.C. § 285 and Rule 54(d) of the Federal Rules of Civil Procedure;

D.     That MTel receive all other or further relief as this Court may deem just or proper.

## DEMAND FOR JURY TRIAL

In accordance with Federal Rule of Civil Procedure 38(b), MTel hereby demands a trial by jury on all issues triable to a jury.

Dated:  January 4, 2016

Respectfully Submitted,

*/s/ Daniel Scardino*
Daniel Scardino
Texas State Bar No. 24033165
Henning Schmidt
Texas State Bar No. 24060569
Drew Zerdecki
Texas State Bar No. 24051562
REED & SCARDINO LLP
301 Congress Avenue, Suite 1250
Austin, TX 78701
Tel.: (512) 474-2449
Fax: (512) 474-2622
dscardino@reedscardino.com
hschmidt@reedscardino.com
dzerdecki@reedscardino.com

ATTORNEYS FOR PLAINTIFF
MOBILE TELECOMMUNICATIONS
TECHNOLOGIES, LLC